[No. B115201. Second Dist., Div. Four. July 12, 1999.]

MICHAEL GUY RECORD, Plaintiff and Appellant, v.
BRIAN REASON, Defendant and Respondent.

474

COUNSEL

Weilbacher & Weilbacher and William John Weilbacher, Jr., for Plaintiff and Appellant.

Horvitz & Levy, Sandra J. Smith; Early, Maslach, Price & Baukol, Kenneth A. Casebier; and Elizabeth Skorcz.Anthony for Defendant and Respondent.

OPINION

CURRY, J.—Appellant Michael Guy Record was injured falling off an inner tube while being towed behind a motor boat driven by respondent

Brian Reason. The trial court concluded that appellant's claim was subject to primary assumption of risk and granted summary judgment in favor of respondent. At the same time, the court denied appellant permission to amend the complaint to assert a cause of action for reckless or intentional behavior. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 18, 1994, appellant accompanied respondent Brian Reason, Patrick Lynch, and Robbi Perron for a day of waterskiing and "tubing"— riding an inner tube towed by a motor boat—at Castaic Lake, using a tube owned by respondent and a motor boat jointly owned by respondent, Lynch, and Brian Heberling who was not present. During that afternoon, appellant began a tube ride while respondent was driving. Lynch and Perron were seated in the back of the boat acting as "spotters" to watch appellant and, if he fell off the tube, to notify respondent and raise a red flag to inform other boaters that someone was in the water. As respondent was turning the boat to the left, appellant spilled from the tube. He sustained a spinal injury requiring surgery and continues to suffer from head, neck, and back pain.

In April of 1995, appellant filed a complaint for personal injuries. He alleged that "[respondent] . . . while negligently operating the ski boat on Castaic Lake, swung the [appellant] who was being towed on an inner tube supplied by [respondent], causing great velocity and a whipping sensation, thereby resulting in the hereinafter stated injuries." The complaint further alleged that "as a direct and proximate result of the negligence, carelessness, recklessness and unlawful conduct of the Defendants, and each of them," appellant was injured and suffered medical expenses.

*Respondent's Motion for Summary Judgment*

Respondent moved for summary judgment in January of 1997. In his moving papers, respondent sought to establish the following facts: "[Appellant] had preexisting injuries involving the same part of the body [appellant] claims were injured in this instant incident . . ."; "[appellant] willingly participated in water tubing/skiing with [respondent] towing him [on the relevant day] on Castaic Lake"; "[respondent] assumed the risks inherent to water tubing/skiing including injury from falling off the innertube"; "[respondent] operated his ski boat at the time of the subject incident in a manner inherent to the sport of water tubing/skiing and within the safety guidelines of the sport of water tubing/skiing"; "[t]here was no action or factor attributed to [respondent] which falls outside the range of the ordinary activities involved in the sport of water tubing/skiing which caused and/or

contributed to [appellant's] fall which is the subject of this lawsuit"; "[respondent] did not consumed [*sic*] any alcoholic beverages or any other substance which would have impaired his ability to safely operate his ski boat on June 18, 1994"; and "[appellant] had fallen off the innertube twice, without incident, prior to the fall which is the subject of this lawsuit."

To establish appellant's assumption of risk, respondent submitted the following specific evidence: appellant's deposition testimony in which he characterized falling out of an inner tube as "[a] common occurrence"; appellant's deposition testimony that in his experience of tubing, "[s]ome people will turn the boat rapidly to get the inner tuber to go much quicker to increase the thrill of the ride. And some people would just tow behind the boat casually just for simple pleasure"; and Lynch's deposition testimony that appellant had said, " 'I'll be fine on the tube,' " in response to respondent's and Lynch's concerns about appellant riding on the tube.

In support of the facts concerning respondent's operation of the boat within the guidelines of the sport of tubing and the range of ordinary activity inherent in the sport, respondent offered the following specific evidence: excerpts from his own deposition testimony indicating that he had no alcohol on the day he was operating the boat, that he read the safety instructions for the tube, that the boat was traveling 15 to 25 miles per hour at the time of appellant's injury, and that he made a gradual left turn; the tube's written instructions specifying the maximum towing speed for adult tube riders to be 25 miles per hour; evidence that Lynch and Perron served as spotters in accordance with the tube's instructions; and appellant's statement in his deposition testimony that respondent was towing him in the middle of the lake away from the shore.

### Appellant's Opposition

Appellant filed an opposition to the motion for summary judgment,[1] providing excerpts from depositions and declarations disputing that he had assumed the risk and that respondent's manner of operating the boat was within the guidelines and range of activity inherent to tubing. Specifically, appellant submitted respondent's deposition testimony showing that he knew of appellant's previous neck injury. Appellant testified at his deposition he told respondent "to go slow and take it easy" and "[k]ick back, [be]cause I don't want to get hurt."

Robbi Perron testified in a declaration that at the time of the incident, the boat's speedometer read 30 miles per hour and respondent "was making a

---

[1]The opposition refers to a separate statement of undisputed facts "filed concurrently herewith" but no such document appears in the record.

sharp left turn." She estimated that the tow line was at least 70 feet long. Perron also recalled a conversation that day between respondent and Lynch on the boat about a game the two were playing where the object was "to try and knock one another off the tube using speed and momentum of the boat." She denied that appellant had fallen off the tube twice before on the day of the incident.

Appellant had said in his deposition testimony that "when [respondent] made the three quarter turn to come around, the inner tube was ripped out from underneath me." Also according to appellant's deposition testimony, "[Lynch's] exact words [after the incident] were, 'You were going way too "F'n" fast.' Or, 'You were going "F'n" fast.' He made comments that I looked like a rag doll bouncing across the water."

Glen H. Egstrom, an expert in underwater kinesiology hired by appellant, stated in his declaration: "Pursuant to accepted standards of safety practiced within the recreational sport of tubing, it is up to the boat driver to use judgment and skill in maintaining safe boat speed and reasonable maneuvers, as well as safe towable speeds. The rider on the towable is virtually at the mercy of the boat driver since the driver can literally sling the tube out to the side of the boat by simply making a turn of the boat."

Egstrom stated that he was "familiar with instructions for various towable devices" and that the particular instructions for the specific type tube involved in the accident provided, " 'Never exceed 25 mph when towing adults or 15 mph when towing children.' " He believed that "[m]ost towable inflatable tubes in the last ten years have carried the recommendations to keep speeds under 20 mph., use a 50-foot tow line and to avoid slingshot type maneuvers that produce high speeds."[2]

Egstrom also observed: "The rider of the towable device is exposed to significant amounts of centrifugal force during any boat turn which slings the towable outside the wake of the boat. This force increases as the speed of the towable increases. Sharp turns result in especially rapid accelerations and can result in the towable attaining speeds and positions relative to the boat that develop slack in the tow line. This situation can be dangerous since the boat may pull the slack out of the line and jerk the towable with enough force to spill the rider." In this regard, Egstrom believed that "[a] well-experienced boat operator such as [respondent] would know that the towed device is reactive to the towing maneuvers of the boat at all times the boat is underway."

[2]Appellant estimated the speed of the tube during the turn approached 50 to 60 miles per hour.

*The Trial Court's Ruling*

The trial court granted summary judgment, on the ground that there was "no triable issue of fact as to primary assumption of risk . . . ." The court concluded tubing qualifies as a sport subject to primary assumption of risk because, "[a tube rider is] a lot like a water skier with differences." The court reasoned, "[tube riders] want to whip around a bit and feel like [they're] water skiing. And [if they] don't have the talent to water ski, you know, and maybe this is a lot of fun. I guess, that's why people do it. But then [the tube rider is] no longer a passenger on the boat, [but] . . . on some little thing being whipped around on the wakes." The court decided no triable issue of recklessness existed so as to eliminate respondent's primary assumption of risk defense because, "even if [the court] chose to accept your facts that the guy is driving five miles an hour more[,] I think that it wouldn't take it out of the [*Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]] case, if Knight applies."

*Appellant's Motion to Amend the Complaint*

Appellant moved for leave to amend his complaint to be heard at the same time as the summary judgment motion. Appellant's counsel stated in a declaration in support of the motion to amend that during the course of pretrial discovery "it was discovered . . . that [appellant] had asked [respondent] to please drive the boat slowly so that [appellant] would not get hurt due to the fact that this was [appellant's] first time on an inflatable 'swept wing' (tube). It was also discovered that at the time of the injury and prior thereto, [respondent] was very much aware of [appellant's ] prior medical condition. [Respondent] acted with intentional, willful, and recklessness [*sic*] abandon when, while exceeding the recommended speed limit and breaking recommended rules regarding turning while pulling said 'swept wing,' maneuvered the boat in such a way as to swing the [appellant] side-to-side causing great velocity and a whipping sensation which threw [appellant] off . . . ." Appellant sought to add the allegation that "[respondent] acted with intentional, willful, and recklessness [*sic*] abandon when, while exceeding the recommended speed limit and breaking the recommended rules regarding turning while pulling said [tube], [he] maneuvered the boat in such a way as to swing the [appellant] side-to-side causing great velocity and a whipping sensation, thereby resulting in [appellant's] permanent severe neck and back injuries." The trial court denied appellant's motion to amend his complaint "as being untimely and having no good cause."

## DISCUSSION

### I

■ Summary judgment is proper only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether . . . [there is] a material issue of fact that requires the process of trial. [Citation.]" (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) We examine the record and determine this appeal according to the rules of appellate review for a grant of summary judgment. (*Monteleone* v. *Allstate Ins. Co.* (1996) 51 Cal.App.4th 509, 514-515 [59 Cal.Rptr.2d 48]; *Southern Cal. Rapid Transit Dist.* v. *Superior Court* (1994) 30 Cal.App.4th 713, 722-723 [36 Cal.Rptr.2d 665].)

■ Appellant challenges the trial court's grant of summary judgment, contending that tubing does not qualify as a sport subject to primary assumption of risk, and that a triable issue of fact exists as to whether assumption of risk applies. ■ Since determining whether the primary assumption of risk doctrine applies resolves the question of whether a duty of care exists, it is "a *legal* question . . . to be decided by the court . . . ." (*Knight* v. *Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696], original italics.) "[W]e determine de novo the existence and scope of the duty . . . ." (*Ann M.* v. *Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 674.)

### A.

■ We first discuss the distinction between primary and secondary assumption of risk and its impact on an injured party's tort claims. The Supreme Court recognized in *Knight* v. *Jewett, supra,* 3 Cal.4th 296, that the assumption of risk defense was not entirely subsumed by the doctrine of comparative negligence announced in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 309.) In *Li,* the court had said that there were two kinds of assumption of risk. In one kind " 'a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence,' " and " 'plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . .' " (*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d at p. 824, original italics.) In the other type, " 'plaintiff is held to agree to relieve defendant of an obligation of reason-

able conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.' [Citations.]" (*Id.* at pp. 824-825.)

The court explained in *Knight* v. *Jewett* that "the distinction in assumption of risk cases to which the *Li* court referred in this passage . . . was between (1) those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk—the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk'—and (2) those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty—what most commentators have termed 'secondary assumption of risk.' " (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 308, fn. omitted.) In cases covered by primary assumption of risk, plaintiff's recovery is "completely barred" because "defendant's conduct did not breach a legal duty of care to the plaintiff . . . ." (*Ibid.*)

 The issue on appeal is whether or not the primary assumption of risk doctrine relied on by the trial court in granting summary judgment applies to the activity involved in this case and thus totally bars appellant's recovery from respondent despite any negligence on the part of respondent.

## B

Of course, "[a]s a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. (See Civ. Code, § 1714.)" (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 315.) The court in *Jewett* recognized that in the sports setting "conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Ibid.*) It gave the following example: "[A]lthough moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. [Citation.]" (*Ibid.*)

 Neither side disputes that "[p]rimary assumption of risk occurs where a plaintiff voluntarily participates in a sporting event or activity involving certain inherent risks. For example, an errantly thrown ball in baseball or a carelessly extended elbow in basketball are considered inherent risks of those respective sports. [Citation.]" (*Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732].) "Duty is constricted in such settings because the activity involves inherent risks

which cannot be eliminated without destroying the sport itself." (*Yancey* v. *Superior Court* (1994) 28 Cal.App.4th 558, 565 [33 Cal.Rptr.2d 777].) Appellant contends, however, that tubing is not a sporting activity subject to primary assumption of risk.

The Supreme Court recognized that activities covered by primary assumption of risk would extend beyond its application in *Knight* v. *Jewett* to competitive contact sports such as football. In the companion case to *Knight* v. *Jewett*, *Ford* v. *Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769] (plurality opinion), the court included water-skiing within the meaning of sporting activity subject to primary assumption of risk, noting: "Even when a water-skier is not involved in a 'competitive' event, the skier has undertaken vigorous, athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport." (3 Cal.4th at p. 345.) "Accordingly," the court concluded, ". . . the general rule limiting the duty of care of a coparticipant in active sports to the avoidance of intentional and reckless misconduct, applies to participants engaged in noncompetitive but active sports activity, such as a ski boat driver towing a water-skier." (*Ibid.*)

The court in *Mosca* v. *Lichtenwalter* (1997) 58 Cal.App.4th 551, 553 [68 Cal.Rptr.2d 58], applied primary assumption of risk to sport fishing, determining that "[h]ooking and catching fish require a great deal of knowledge, physical skill, and attention." Golf, another less active sport, falls within the meaning of a sporting activity subject to primary assumption of risk because "[h]itting a golf ball at a high rate of speed involves the very real possibility that the ball will take flight in an unintended direction. If every ball behaved as the golfer wished, there would be little 'sport' in the sport of golf." (*Dilger* v. *Moyles* (1997) 54 Cal.App.4th 1452, 1455 [63 Cal.Rptr.2d 591].)

In *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [38 Cal.Rptr.2d 65] the sport involved was white water rafting, an activity similar to tubing in that the riders are usually at the mercy of the elements and the operator of the raft. The court held that primary assumption of risk applied, discerning that "[i]t is the thrill of challenging nature and running the rapids without mishap . . . [that] sets it apart from, for example, a trip down the giant slide at Waterworld." (32 Cal.App.4th at p. 256.)

At the same time, primary assumption of risk was held not to apply to recreational dancing precisely because, ". . . whatever the reach of the rule, it would seem to apply only when engaging 'in a potentially dangerous activity or sport.' [Citation.] As we perceive it, recreational dancing is not

such a dangerous activity. Consequently, this case involves what the *Knight* court calls 'secondary assumption of risk.' " (*Bush* v. *Parents Without Partners* (1993) 17 Cal.App.4th 322, 328 [21 Cal.Rptr.2d 178].)

██ Compiling all of the distinguishing factors, it appears that an activity falls within the meaning of "sport" if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury. ██ From the evidence presented, tubing meets these criteria. Egstrom, in his declaration, described the equipment used, the force and speed experienced by the rider even when the boat is going at recommended speeds, the skill needed by the boat operator, and how the rider's position affected his ability to stay on. In his deposition, appellant described the enjoyment a rider receives from tubing as ranging from, the "simple pleasure" of being casually towed behind the boat to the "thrill" of the boat turning rapidly to get the inner tuber to go much quicker. Inner tubing thus appears to be a variation of waterskiing designed to accommodate those eager to experience the force of whipping around the wakes but lacking the ability to water-ski. Combating centrifugal force with a white-knuckled grip on the tube handles entails at least as much physical exertion as sport fishing. Skill in developing a steadfast grip and feel for the tube as it travels is required, and an experienced tube rider will obviously have a greater ability to stay on the tube than a beginner. For these reasons, we hold that tubing is a sporting activity subject to primary assumption of risk.

### C

Appellant contends that even if tubing is a sport covered by primary assumption of risk, the trial court erred in granting summary judgment because a triable issue of fact existed as to whether the doctrine applies. Appellant points to three factors which he maintains distinguishes this situation from those in which primary assumption of risk has barred recovery. First is the factor that alienates our dissenting colleague: appellant's communicated desire that respondent go slowly and take it easy due to his preexisting injury.

The Supreme Court has already said that a party cannot change the inherent nature and risk of a sport by making a unilateral request that other participants play less vigorously. The plaintiff in *Knight* v. *Jewett*, which involved touch football, had asked the defendant " 'not to play so rough' " and " 'be careful.' " (3 Cal.4th at p. 300.) ██ The court concluded that a defendant's liability must be based on "the nature of the sport itself" rather than "the particular plaintiff's subjective knowledge and expectations

. . . ." (*Id.* at p. 313.) If not, "there would be drastic disparities in the manner in which the law would treat defendants who engaged in precisely the same conduct, based on the often unknown, subjective expectations of the particular plaintiff who happened to be injured by the defendant's conduct." (*Ibid.*) The court believed that such an approach "not only would be inconsistent with the principles of fairness underlying the *Li* decision, but also would be inimical to the fair and efficient administration of justice. If the application of the assumption of risk doctrine in a sports setting turned on the particular plaintiff's subjective knowledge and awareness, summary judgment rarely would be available in such cases, for, as the present case reveals, it frequently will be easy to raise factual questions with regard to a *particular* plaintiff's *subjective* expectations as to the *existence* and *magnitude* of the risks the plaintiff voluntarily chose to encounter. By contrast, the question of the existence and scope of a defendant's duty of care is a *legal* question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury. [Citation.]" (*Ibid.*, original italics.)

██ In *Ford* v. *Gouin, supra*, 3 Cal.4th 339, where the plaintiff had been injured while waterskiing barefoot and backwards, the court similarly held that a plaintiff's subjective expectations cannot change the nature of the sport: "As we have explained at some length in *Knight, supra*, . . . the question whether plaintiff's action properly was barred under the assumption of risk doctrine does not depend on the reasonableness or unreasonableness of plaintiff's action in skiing backward and barefoot in a narrow tree-lined channel, nor on whether plaintiff subjectively knew of the specific risk of harm posed by defendant's allegedly negligent driving or impliedly consented to relieve or excuse defendant of a duty of care owed to plaintiff. Instead, the propriety of the summary judgment turns on whether defendant's alleged conduct breached the legal duty of care that defendant owed to plaintiff." (3 Cal.4th at p. 344.)

As we have seen, tube riders engage in the activity of tubing in order to experience the thrill of whipping across the water at speeds which challenge their ability to stay on the tube. Both appellant and respondent testified via deposition that falling out of the inner tube is a "common occurrence" and that "[e]verybody falls off the innertube." Neither appellant's preexisting injuries nor his admonition to respondent to "[k]ick back" and "take it easy" can be used to define the nature of the activity or the parties' relationship to it. Nor can these factors be used to redefine the ordinary range of activity

and the concomitant risks inherent in the sport and thus enlarge the potential liability of coparticipants.[3]

Second, appellant contends that a triable issue of facts exists as to whether respondent's alleged recklessness in operating the boat at the time of appellant's injury increased the risks inherent in the sport. He points to the facts which suggest that respondent was going 30 miles per hour and making a sharp turn at the time of the injury. Appellant's expert testified that these actions exceeded the recommendations of the manufacturers of tubing equipment.

■■■ "[D]efendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 316.) The Supreme Court recognized in *Knight* v. *Jewett* that "a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability— . . . if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320, fn. omitted.)

Conduct is considered "totally outside the range of ordinary activity involved in the sport (and thus any risks resulting from that conduct are not inherent to the sport) if the prohibition of that conduct would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport." (*Freeman* v. *Hale* (1994) 30 Cal.App.4th 1388, 1394 [36 Cal.Rptr.2d 418].) "[A] coparticipant . . . will be liable for, e.g., intentional assault or other 'reckless conduct that is totally outside the range of the ordinary activity involved in the sport.' [Citation.]" (*Allan* v. *Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1368 [59 Cal.Rptr.2d 813].)

■■■ Whether driving slightly above the recommended speed for the sport and making too sharp a turn constituted reckless conduct which increased the risks above those inherent in the sport was addressed by the Supreme Court in *Ford* v. *Gouin,* wherein the court stated: "Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct

---

[3]We do not necessarily disagree with our colleague's argument that, in addressing assumption of the risk, the law should take into consideration an express agreement between participating parties which may alter the nature of the risk. However, this is not the case to address that issue. We do not believe that the evidence proffered by appellant is sufficient, as a matter of law, to establish such an agreement.

in various sports. As a result, holding ski boat drivers liable for their ordinary negligence might well have a generally deleterious effect on the nature of the sport of waterskiing as a whole." (*Ford* v. *Gouin, supra,* 3 Cal.4th at p. 345.)

The same rationale applies here. Even assuming, as we must for summary judgment review purposes, that the boat was traveling five to ten miles per hour over the recommended speed limit for towing adults in the tube and that respondent made a sharp three-quarter turn, respondent's activity was merely negligent, "an 'inherent risk' of [the] sport," barring recovery for the appellant. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 316.) Holding a boat driver to a duty to ensure the tube rider does not fall off the tube would inevitably chill the driver's willingness to provide the exciting ride that appears to be necessary to tubing and would narrow the spectrum of excitement, changing the fundamental nature of the sport. Appellant did not meet his burden of showing that the alleged conduct was outside the boundaries of the sport.

Finally, appellant contends that the control the boat driver has over the tube rider's speed and direction removes tubing from primary assumption of risk because the boat driver is not a coparticipant with the tube rider but controls the tube rider's activity. He likens the relationship to that of instructor and pupil. (See, e.g., *Wattenbarger* v. *Cincinnati Reds, Inc., supra,* 28 Cal.App.4th 746 [persons supervising baseball tryouts owed duty to minor to advise him to stop pitching after he felt his arm "pop"]; *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [riding instructor owed duty to refrain from raising jumps beyond the student's experience and ability]; *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] [instructor owed duty to jockey trainee who was injured after following instructions to exercise a lame horse on a rocky track].)

Appellant's attempt to analogize respondent to an instructor or supervisor lacks merit. Appellant was not under the tutelage of the respondent, and respondent had no position of authority over him. They were friends who chose to take a trip together to a lake to engage in a mutually enjoyable sport. "Under the reasoning of *Knight*, participants are . . . those actively engaged in the game or other activity." (*Wattenbarger* v. *Cincinnati Reds, Inc., supra,* 28 Cal.App.4th at p. 754, fn. 6.) In *Ford* v. *Gouin, supra,* 3 Cal.4th at page 345, the court held that the boat driver was a coparticipant in the sport of waterskiing. A boat driver is equally as integral to tubing as to waterskiing. (See also *Ferrari* v. *Grand Canyon Dories, supra,* 32 Cal.App.4th 248 [person riding on a white water raft was a participant in the

sport and subject to primary assumption of risk].) We see no reason to question respondent's status as a coparticipant.

## II

Appellant also challenges the trial court's denial of leave to amend his complaint. Appellant sought to amend the complaint to allege a claim of intentional or reckless conduct.

 "[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]" (*Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 135-136 [125 Cal.Rptr. 59].)

 The only facts supporting the motion to amend were put forth in a conclusory declaration of counsel in which he stated: "[I]t was discovered through the process of discovery that [appellant] had asked [respondent] to please drive the boat slowly so that [appellant] would not get hurt due to the fact that this was [appellant's] first time on an inflatable 'swept wing' (tube). It was also discovered that at the time of the injury and prior thereto, [respondent] was very much aware of [appellant's] prior medical condition. [Respondent] acted with intentional, willful, and recklessness [*sic*] abandon when, while exceeding the recommended speed limit and breaking recommended rules regarding turning while pulling said 'swept wing,' maneuvered the boat in such a way as to swing the [appellant] side-to-side causing great velocity and a whipping sensation which threw [appellant] off . . . ."

As we have said, the court in *Ford* v. *Gouin* concluded that "making too sharp a turn," or "pulling the skier too rapidly," constitutes "ordinary negligence[.]" (3 Cal.4th at p. 345.) In general, only conduct that "will very probably cause harm" rises to the level of reckless and wanton conduct. (*Donnelly* v. *Southern Pac. Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465].) Although respondent may have intended the actions he undertook in maneuvering the boat, there is no evidence that he intended to throw appellant into the water and cause him to injure his back. Nor was this consequence so inevitable as to transform respondent's actions in maneuvering the boat from negligence to recklessness.

 Moreover, "even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." (*Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939-940 [119 Cal.Rptr. 82].) Appellant had knowledge of the circumstances

on which he based the amended complaint on the day he was injured, almost three years before he sought leave to amend. Appellant's reliance on *Honig* v. *Financial Corp. of America* (1992) 6 Cal.App.4th 960, 966 [7 Cal.Rptr.2d 922], is misplaced. In that case the court held the trial court abused its discretion by denying the appellant leave to amend his complaint after respondents moved for summary judgment. *Honig* is distinguishable from the instant situation because the events giving rise to new causes of action transpired subsequently to the filing date of the initial complaint. Here, appellant's amendment arises from the same conduct as that in the original complaint.

Finally, we do not see how appellant could have been prejudiced by the rejection of the proposed amendment. In order to determine whether primary assumption of risk applied, the trial court was obliged to focus on whether respondent's conduct was reckless, and appellant put forth nearly identical evidence in opposition to summary judgment as he did in support of the motion to amend. For all these reasons, we conclude the trial court did not abuse its discretion in denying appellant leave to amend his complaint.

## DISPOSITION

The judgment is affirmed.

Hasting, J., concurred.

**VOGEL (C. S.), P. J.**—I respectfully dissent. Contrary to the approach taken by the majority, I believe decisional law permits the parties to a sporting activity to agree to limit or reduce the possibility of injury by subjecting the activity to various restrictions and thereby impose a duty of care upon the participants. The record indicates a material dispute exists as to whether the parties made such an agreement in this case. Therefore, the majority errs in concluding that this lawsuit can be resolved by summary judgment.

Appellant's opposition to respondent's motion for summary judgment included excerpts of his own deposition testimony and that of respondent Reason, and the declarations of Robbi Perron, a third party witness who was a spotter on the ski boat on the day of the accident, and of Dr. Glen H. Egstrom, an expert witness in aquatic kinesiology. In summary, appellant established the following material issues of fact to support his contention that respondent Reason had a duty to limit the inherent risks incurred in tubing:

(1) Respondent Reason and Patrick Lynch were aware that appellant was physically vulnerable and had suffered a previous back injury. As he was

getting on the inner tube and before the boat pulled away from the dock, appellant told respondent Reason to "go slow and take it easy. Kick back 'cause I don't want to get hurt" and " '[t]ake it easy. Don't show off.' "

(2) After the boat began towing the inner tube it reached a speed of 30 miles per hour and appellant hand signaled to slow down just before the boat turned "pretty hard to the left and the inner tube picked up speed to about 50 to 60 miles an hour [pulling] the tube out from underneath [appellant], and [he] fell off the inner tube."

(3) The declaration of Robbi Perron, one of the spotters on the ski boat the day of the accident, stated that "[appellant] Record specifically said to [respondent] Reason, 'Don't F—around, go slow and take it easy. I don't want to get hurt.' " She also stated: "During Record's ride on the tube, I noticed him struggling to hold on and attempting to signal us to slow down. At this time I turned to Reason and observed the speedometer to be pegging 30 mph at which time I tried to ad[vi]se him to slow down. At that particular time, the boat was making a sharp left turn," and "[t]he tube ride was Record's first and only ride on the tube and he did not fall off the tube prior to the accident."

(4) In his declaration, Dr. Egstrom stated that he was familiar with the instruction for the specific type of tube involved in the accident here which provided: " 'Never exceed 25 mph when towing adults or 15 mph when towing children.' "

Respondent does not contradict appellant's and Perron's statements that Reason was told to go slow and take it easy. However, he disputes appellant's showing as to the speed and operation of the ski boat. Respondent states that the ski boat was traveling between 15 and 25 miles per hour and that he made only a gradual to medium turn of the boat just before the accident, and, appellant did not make a hand signal to slow down.

Therefore, it is evident that there are disputed issues of material fact regarding the existence of an explicit understanding between appellant and respondent and, if so, whether respondent failed to abide by that understanding. That factual dispute must be decided before it can be concluded that appellant's claim is barred by primary assumption of risk as a matter of law.

The majority reasons that appellant cannot establish that respondent owed any duty of care notwithstanding appellant's showing in opposition to the summary judgment proceedings. Relying on *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] and *Ford* v. *Gouin* (1992) 3

Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769], the majority concludes that tubing is a "sport" in which ". . . the careless conduct of others is treated as an 'inherent risk' of a sport, thus barring recovery by the plaintiff." (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 316.) I submit that the majority's analysis is too restrictive. Neither *Knight* v. *Jewett* nor *Ford* v. *Gouin* precludes participants engaging in a cooperative recreational activity from agreeing to participate in a manner to avoid or reasonably reduce the inherent risk of the activity. Such agreement would impose a duty of care defined by the tenor of their understanding.

In *Knight* v. *Jewett,* the plaintiff engaged in an informal game of touch football and was injured by another player whom she had admonished " 'not to play so rough or I was going to have to stop playing.' " (3 Cal.4th at p. 300.) The court held that the plaintiff's claim was barred by primary assumption of risk. Its analysis turned on a consideration of various sporting activities that involve inherent risks and where such risk adds to the expected excitement of the participants. "In reaching the conclusion that a coparticipant's duty of care should be limited . . . , the cases have explained that, in the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. The courts have concluded that vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct. The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Id.* at pp. 318-319, italics in original.)

*Knight* v. *Jewett* applies primary assumption of risk to vigorous, competitive sports and recreational activities engaged in by participants who wish to achieve maximum excitement and exhilaration without any regulation of their own conduct or the conduct of others. It is revealing that the court noted in *Knight* v. *Jewett* that "No rules were explicitly discussed before [the touch football] game." (3 Cal.4th at p. 300.) That indicates that primary assumption of risk may not necessarily apply to a casual game of touch football played where there is an explicit agreement at the outset that there will be no blocking or tackling, and limiting physical contact to only touching the ball carrier. Any player failing to play according to that understanding should be viewed as violating his duty of care to other players. In other words, the court recognizes that participants may of their own volition limit, reduce, or avoid inherent risks of any sport by mutually prescribing in advance the manner in which the game is generally played.

The majority applies primary assumption of risk in the present matter because it sees no difference between tubing and waterskiing, drawing a parallel here with *Ford* v. *Gouin, supra,* 3 Cal.4th 339. In *Ford* v. *Gouin,* the plaintiff water-skied facing backwards and barefoot in a narrow channel. The plaintiff was a very experienced water-skier, selected the waterskiing site, wore protective equipment, and was clearly aware of the hazards of water-skiing. More importantly, there is no indication in the underlying summary judgment proceeding that there was any understanding between the plaintiff water-skier and the driver of the ski boat that the driver would do anything to limit the inherent risks of waterskiing. In other words, there were no disputed material facts and the matter was properly disposed of as primary assumption of risk as a matter of law.

*Ford* v. *Gouin* does not support the proposition that primary assumption of risk is automatically applied to individuals who participate in recreational activity involving an inherent risk, where they agree to limit or reduce the possibility of injury by agreeing to participate according to certain restrictions.

I submit that the majority has narrowly focused on the Supreme Court's observation that sporting and recreational activities will be less amenable to summary disposition unless it is recognized that the nature of such pursuits necessarily involves inherent risks which generally eliminate any duty of care by the participants to each other save for willful and reckless conduct. In *Knight* v. *Jewett,* the court specifically makes that point: "If the application of the assumption of risk doctrine in a sports setting turned on the particular plaintiff's *subjective* knowledge and awareness, summary judgment rarely would be available in such cases, for, as the present case reveals, it frequently will be easy to raise factual questions with regard to a *particular* plaintiff's *subjective* expectations as to the *existence* and *magnitude* of the risks the plaintiff voluntarily chose to encounter. By contrast, the question of the existence and scope of a defendant's duty of care is a *legal* question which depends on the nature of the sport or activity in question and on *the parties' general relationship to the activity,* and is an issue to be decided by the court, rather than the jury." (3 Cal.4th at p. 313, original and added italics.)

"[T]he parties' general relationship to the activity" may, as here, be in dispute preventing a determination of which category of assumption of risk applies. Until there is a factual determination of whether appellant and respondent agreed to engage in tubing only under conditions to "go slow and take it easy," appellant's claim cannot be barred as a matter of law. Neither the trial court nor this court may ignore the evidence which supports

appellant's claim that respondent had a duty to limit the risks inherent in tubing by "go[ing] slow and tak[ing] it easy. Kick back, 'cause I don't want to get hurt."

In asserting, "As we have seen, tube riders engage in the activity of tubing in order to experience the thrill of whipping across the water at speeds which challenge their ability to stay on the tube" (maj. opn., *ante*, at p. 483), the majority assumes a fact which is disputed. Appellant asserted in his deposition that tubing can range from thrilling to the simple pleasure of being casually towed behind the board. (*Id.* at p. 482.) The record could support a reasonable inference that between themselves, appellant and respondent agreed to engage in only the latter type of casual, easy tubing.