Filed 5/23/23  Napitupulu v. Mad Science Laboratories CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JONATHAN NAPITUPULU, | B317570 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC129321) |
| v. | |
| MAD SCIENCE LABORATORIES, LLC, | |
| Defendant and Respondent. | |

Appeal from the judgment of the Superior Court of Los Angeles County, H. Jay Ford, III, Judge.  Affirmed.

Law Office of Gene H. Shioda, Gene H. Shioda and James A. Kim for Plaintiff and Appellant.

Kingfisher Law, Nithin Kumar; Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, Ekwan E. Rhow and Thomas R. Freeman for Defendant and Respondent.

_____

This appeal involves a wage claim by appellant Jonathan Napitupulu (Napitupulu), a laboratory scientist, against respondent Mad Science Laboratories, LLC, doing business as "Rehab Lab" (Mad Science). For the reasons more fully set forth below, we affirm the trial court's grant of summary judgment to Mad Science on the ground that he had no wages due.

In 2016, Mad Science hired Napitupulu to serve as its technical supervisor. Mad Science agreed to pay Napitupulu an annual salary of $170,000 for his work in that role. Mad Science also transferred a five percent ownership interest in its business to Napitupulu, which entitled him to additional compensation in the form of profit-sharing payments. Napitupulu's 2016 profit-sharing compensation totaled approximately $115,490. The parties agree that Mad Science employed Napitupulu on an "at will" basis, and on August 9, 2016, Napitupulu signed an "employee statement" containing an acknowledgement to that effect. (Capitalization omitted.)

In January 2017, Mad Science informed Napitupulu that it could no longer afford to pay him a fixed annual salary, but that it would continue to make monthly profit-sharing payments. Notwithstanding the reduction in his compensation, Napitupulu continued working as Mad Science's technical supervisor through mid-October 2017. Between January and October 2017, he received 10 profit-sharing payments from Mad Science totaling at least $103,500. On October 17, 2017, however, Napitupulu sent an email to Mad Science in which he resigned and stated his "inten[tion] to file a wage claim with the Labor Department for the wages [Mad Science had] failed to pay [him] since January 2017." (Capitalization added.)

On May 24, 2018, Napitupulu filed a complaint against Mad Science in the Los Angeles County Superior Court asserting

2

a single cause of action for failure to pay wages under Labor Code sections 201, subdivision (a), 204, subdivision (a), and 204.2.[1] Napitupulu alleged that under "the terms of [his 2016] employment agreement, [Mad Science] promised [him] a fixed compensation of a monthly salary in the amount of $14,166.16 in exchange for the performance of his job duties," and that he "was in fact never paid any of his wages for the approximate[ly] nine months [he] performed his duties . . . in 2017." He sought $134,578.52 in unpaid wages, as well as waiting time penalties equal to "[30] days of wages in the amount of $14,166.16."[2] Napitupulu's complaint

---

[1] Unless otherwise specified, all statutory references are to the Labor Code.

Section 201, subdivision (a) requires the immediate payment of any "wages earned and unpaid at the time of [an employee's] discharge." (§ 201, subd. (a).) Section 204, subdivision (a) mandates, with certain exceptions, that "[a]ll wages . . . earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." (§ 204, subd. (a).) Finally, section 204.2 provides, in relevant part, that "[s]alaries of executive, administrative, and professional employees of employers covered by the Fair Labor Standards Act of 1938 . . . earned for labor performed in excess of 40 hours in a calendar week are due and payable on or before the 26th day of the calendar month immediately following the month in which such labor was performed." (§ 204.2.)

[2] Although the complaint alleges that "[t]he total amount of unpaid wages due . . . is calculated at $1345,578.52," this is a typographical error. Napitupulu's declaration in opposition to summary judgment provides that the total amount of allegedly unpaid wages is $134,578.52. The complaint's reference to "the waiting time penalties set forth in . . . [section] 204" appears to be

3

also sought attorney's fees and interest under sections 218.5 and 218.6.

After more than three years of litigation, on July 19, 2021, Mad Science moved for summary judgment on the ground that it had no obligation to pay Napitupulu a fixed annual salary in 2017. Mad Science argued that it had the authority to unilaterally modify the terms of Napitupulu's at-will employment, including by reducing his wages. As a result, once it notified Napitupulu in January 2017 of its decision not to continue paying him a fixed annual salary in addition to profit-sharing payments, it ceased to have any obligation to do so.

In response, Napitupulu filed both (1) an opposition to Mad Science's motion, along with supporting declarations, and (2) a motion for leave to file an amended complaint, which sought to add new causes of action against Mad Science and to name additional defendants. Napitupulu did not file objections to any evidence supporting Mad Science's motion. Mad Science then filed a reply brief and evidentiary objections.

On October 19, 2021, the trial court heard argument on the motions and then took the matters under submission. In a subsequent written ruling, the court granted summary judgment in favor of Mad Science and denied Napitupulu's motion for leave to amend. The court did not rule on Mad Science's evidentiary objections. Napitupulu timely appealed.

Although Napitupulu identifies five "issues on appeal" (capitalization omitted), in reality, he makes two arguments:

---

another typographical error. Section 204 does not contain any provisions concerning waiting time penalties, and we assume that Napitupulu intended to refer to the penalties available under section 203.

4

(1) the trial court erred in granting summary judgment to Mad Science, and (2) the court abused its discretion in denying his motion for leave to file an amended complaint. We disagree with both contentions.

Applying a de novo standard of review, we conclude that the trial court properly granted summary judgment to Mad Science. (See *Peralta v. The Vons Companies, Inc.* (2018) 24 Cal.App.5th 1030, 1034 ["[w]e review a trial court's granting summary judgment de novo"].) "[A]n employer may unilaterally alter the terms of an [at-will] employment agreement," including by reducing an employee's wages, "provided such alteration does not run afoul of the Labor Code." (*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 619–620, citing *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637.) "An 'employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions.' [Citation.]" (*Id.* at p. 620.)

Here, Mad Science has presented undisputed evidence of Napitupulu's status as an at-will employee. Mad Science also has presented undisputed evidence that it notified Napitupulu in January 2017 of its decision to cease paying him a fixed salary, and that Napitupulu nonetheless continued to work as the lab's technical supervisor until October 2017. Although Napitupulu urges that he never expressly "agreed to a loss of his wages," he accepted the changed terms and conditions of employment by virtue of his decision to continue working for Mad Science. (See *Schachter*, *supra*, 47 Cal.4th at p. 610.) We therefore agree with Mad Science that it had no obligation to pay Napitupulu any fixed salary payments in 2017.

As he did before the trial court, Napitupulu advances three alternative theories of liability that he contends defeat summary judgment.  First, Napitupulu insists that Mad Science's 2017 profit-sharing payments do not "qualify as substitute wage compensation" under California law or the Fair Labor Standards Act.  Napitupulu's argument appears to be that because the profit-sharing compensation he received in 2017 cannot qualify as "wages," he effectively worked for Mad Science for free in 2017, and Mad Science therefore violated California's minimum wage laws.  Second, Napitupulu contends that Mad Science violated sections 204 and 226[3] by failing to make timely profit-sharing payments and by failing to provide wage statements reflecting those payments.  Third, Napitupulu urges that Mad Science breached the parties' profit-sharing agreement by ceasing to pay profit-sharing payments to him following his October 2017 resignation.

As to Napitupulu's first theory, *Schachter* instructs that "[i]ncentive compensation, such as bonuses and profit-sharing plans, . . . constitute wages" under California law. (*Schachter*, *supra*, 47 Cal.4th at p. 618.)  Napitupulu concedes this legal principle, but argues that the profit-sharing payments at issue here are distinguishable from those in *Schachter* because his ownership interest in Mad Science is fully vested.  Even if the vesting status of Napitupulu's ownership interest affects whether his profit-sharing compensation qualifies as wages (a point we need not decide), Napitupulu fails to point to any evidence demonstrating

---

[3] Section 226 sets forth, inter alia, information that an employer must include in an employee's wage statements.  (§ 226.)

the purportedly fully vested nature of his ownership interest.[4] (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 492 (*Hutton*) [once defendant makes the requisite summary judgment showing, "the burden shifts to the plaintiff to produce evidence demonstrating the existence of a triable issue of material fact"].)

Moreover, none of Napitupulu's three alternative theories appears anywhere in his complaint. "[T]he burden of a defendant moving for summary judgment only requires that [it] negate plaintiff's theories of liability *as alleged in the complaint*" (*Hutton, supra*, 213 Cal.App.4th at p. 493), and Napitupulu therefore cannot rely on his unpleaded theories to defeat summary judgment.

Nor do any of the purportedly disputed facts Napitupulu identifies preclude summary judgment. He urges that the parties dispute whether (1) Mad Science first hired Napitupulu directly in 2016 or indirectly through a staffing agency in 2015, (2) entities allegedly affiliated with Mad Science that appear on some of Napitupulu's employment-related documents qualify as joint employers for purposes of his wage claim, and (3) Mad Science misrepresented to Napitupulu in 2017 that the Internal Revenue Service prohibits paying a worker wages in addition to profit distributions.

---

[4] We reject Napitupulu's related argument that the trial court erred by denying his request for a continuance to permit more discovery on the vesting issue. In denying his request, the trial court noted Napitupulu's failure to present any "evidence why the sought-after discovery was not obtained before the opposition [to Mad Science's summary judgment motion] was filed." Napitupulu similarly fails to identify any such evidence on appeal.

7

None of these disputes is material, however, because none alters the three dispositive facts here—namely, that (1) at some point prior to January 2017, Mad Science hired Napitupulu directly as an at-will employee; (2) Mad Science notified Napitupulu in January 2017 of its decision to modify the terms of his at-will employment; and (3) Napitupulu nonetheless chose to continue working for Mad Science through October 2017. Accordingly, we conclude that Mad Science met its summary judgment burden, and the trial court correctly granted summary judgment in favor of Mad Science.

We conclude further that the trial court did not abuse its discretion in denying Napitupulu's motion for leave to file an amended complaint. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 (*Record*) [denial of leave to amend reviewed for abuse of discretion].) Through the proposed amendment, Napitupulu sought to name five additional defendants and to add causes of action for (1) breach of fiduciary duty against one of the new defendants, and (2) "winding up and dissolution; sale of membership interest" against Mad Science and several of the new defendants. (Boldface and capitalization omitted.)

We agree with the trial court's conclusion that these new claims are at best tangentially related to Napitupulu's claim for unpaid wages, and that "[n]othing in the proposed [amended complaint] changes the[ ] undisputed material facts" that entitle Mad Science to summary judgment on the wage claim. Moreover, following three years of litigation, Napitupulu waited until just six weeks before trial to seek leave to amend his complaint. (See *Record*, *supra*, 73 Cal.App.4th at p. 486 [" 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial' "].) On

8

this record, we cannot conclude that the court abused its discretion in denying leave to amend.[5]

## DISPOSITION

We affirm the December 20, 2021 judgment. Mad Science is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.

---

[5] We note that Napitupulu subsequently filed a separate action asserting claims substantially similar to the new claims he sought to present in his proposed amended complaint in this action. (See *Napitupulu v. Mad Science Laboratories, LLC* (Super. Ct. L.A. County, No. 22SMCV00132).) On February 21, 2023, the trial court overruled Mad Science's demurrer to the second amended complaint filed in that action, and set a case management conference for June 7, 2023.