Filed 9/12/13  Murphy v. Matas CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LYNETTE MURPHY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>DAVID MATAS et al.,<br><br>        Defendants and Respondents. | A135758<br><br>(Alameda County Super. Ct.<br>  No. HG11568014)<br><br>**ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on August 23, 2013, be modified as follows:

On page 12, in the last sentence of the first full paragraph, replace the last word "boat" with "tube."  The sentence is thereby modified to read:

In support of this, she cites the speed of the boat, the fact that other people complained of injuries, and the fact that one child was thrown from the tube.

On page 12, the first sentence of the second full paragraph is also modified to read:

None of Murphy's evidence creates a triable issue regarding whether Matas intended to throw people from the tube.

On page 15, the following sentence of the last paragraph is modified to read:

Indeed, Murphy presented the contents of the manuals in support of her opposition to the summary judgment motions.

The petition for rehearing is denied.

Kline, P.J.

Filed 8/23/13  Murphy v. Matas CA1/2  (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LYNETTE MURPHY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DAVID MATAS et al.,<br><br>Defendants and Respondents. | A135758<br><br>(Alameda County<br>Super. Ct. No. HG11568014) |

Lynnete Murphy was injured while riding in an inflatable raft or tube while being towed behind a motorboat driven by David Matas, a pastor at Cornerstone Fellowship of Livermore, California (Cornerstone).  Steve Viss owned the motorboat and tube.  Murphy sued Matas and Cornerstone for negligence and Viss and Cornerstone for negligent entrustment.[1]  The trial court concluded that both of Murphy's claims were subject to the defense of primary assumption of risk and granted summary judgment against Murphy's claims.  Murphy appeals and asserts that primary assumption of risk does not bar her claims.  We affirm the judgment.

## BACKGROUND

On August 15, 2010, Murphy, her husband, and two stepchildren attended a recreational event, Cornerstone Fellowship Singles Ministry Water Day Event, organized and promoted by Matas and Cornerstone.  The event was at Lake Hogan in Valley

---

[1]  Murphy also sued another individual for negligent entrustment but he was, subsequently, dismissed as a defendant.

1

Springs, California.  The recreational activity of tubing was offered at the event.  Tubing, according to Viss, "is a water activity in which individuals ride on an inflatable raft, such as the ski tube, while it is being towed by a motorboat."

Matas borrowed a motorboat and a Sea-Doo Triangle Towable Ski Tube (Sea-Doo tube or raft) that were owned by Viss for the church event.  Viss did not attend.  Matas operated the motorboat and towed the Sea-Doo tube, which accommodated three persons.  During one of the rides, Murphy's husband and two stepchildren rode in the motorboat with Matas and Murphy, a child, and another adult rode in the tube.  Murphy was not ejected from the tube during her ride.  After Murphy rode in the tube, her husband and her stepson rode in the tube; Murphy took a video of them.

On March 28, 2011, Murphy filed a complaint for negligence against Matas and Cornerstone and for negligent entrustment against Cornerstone, Viss, and Paul Schaffer.  Murphy alleged that Viss and Schaffer jointly owned the motorboat driven by Matas.  She alleged that Matas operated the "motorboat at excessive speed, and caus[ed] the motorboat and those being towed in the inflatable raft to make sharp 'S' turns . . . ."  She claimed that Matas operated the motorboat seven to eight miles per hour over the recommended speed limit for the tube.  She asserted that Matas's improper operation of the boat resulted in the inflatable raft's crossing a wake, and caused the raft to be thrown up in the air from the surface of the water.  She claimed that the raft then landed "with great force on the water's surface[.]"  Murphy maintained that she severely injured her back as she suffered a compression fracture of one of her lumber vertebrae and damage to her intervertebral discs at various places throughout her spine.  As a result, Murphy had to have back surgery to repair the fracture to her lumbar vertebra.

Matas and Cornerstone[2] moved for summary judgment and Viss separately moved for summary judgment; Murphy opposed both motions.  Murphy did not dispute that Viss was the sole owner of both the Sea-Doo tube and motorboat and that Schaffer did not own the motorboat.  The motions for summary judgment were based on the argument that

_____

[2]  This summary judgment motion was also filed on behalf of Schaffer but he was dismissed as a defendant on December 8, 2011.

2

the primary assumption of risk defense completely barred Murphy's negligence and negligent entrustment claims.

Defendant filed two declarations in support of the motions for summary judgment. Schaffer declared that he had substantial experience with tubing as both a tube rider and boat operator since 1993. He declared that "[t]ubing on a lake typically involves pulling passengers on a tube, at a relatively high rate of speed." He asserted: "In my experience, tube riders engage in the activity of tubing in order to experience the thrill of whipping across the water at speeds [that] challenge their ability to stay on the tube. During tubing, it is typical for the driver of the boat to make sharp turns, which cause the tube to travel over the boat's wake at an increased speed. This often causes the tube to become airborne, which is intended [to] increase the thrill of the ride because it increases the chance that they will fall off the tube. During tubing, riders often fall off the tube."

Similarly, Viss declared that he had substantial experience with tubing as both a tube rider and a boat operator and that "[t]ubing on a lake typically involves pulling passengers on the ski tube at a relatively high rate of speed with the intended purpose of challenging the riders' ability to remain in or on the tube through quick and sometimes sharp turns of the boat causing the tube to increase in speed and travel over the boat's wake. When a tube crosses the wake of a boat, the tube and its riders experience a turbulence effect[,] which further increases the physical challenge of remaining in the tube because the riders are jostled about, sometimes violently. This frequently causes the tube to become airborne, which is typically viewed by tube riders to add to the thrill of the ride because of the increased physical challenge and the increased risk of falling off the tube. Tubing rides typically end when a rider falls off the tube."

In opposition to the motions for summary judgment, Murphy presented Matas's deposition testimony. Matas stated that he had driven a motorboat that towed passengers in a tube hundreds of times and that he had operated the motorboat in a manner designed to eject passengers from the tube but that was not his normal manner of operating. He explained that a person wanting a ride with a greater thrill could use a device that permits the person "to roll off" more easily but that he would give that type of ride only if it were

3

safe and desired by the rider. The tube he used when Murphy was riding was not designed for people to fall off of it. He acknowledged knowing that Murphy had been in the hospital just prior to the event; he had told her that maybe she should not participate in tubing. He admitted that another person also claimed a sore neck as a result of riding in the tube towed by him and that person had reported to him that she believed he had gone too fast. He noted five other people commented that they were sore as a result of the tube ride. Another person at the event was towing a tube with riders and Matas was not aware of anyone in that tube being injured.

Murphy also submitted Viss's deposition testimony. Viss testified that the Sea-Doo tube had a warning label on the side of the tube regarding the maximum speed for towing. He believed the speed limit stated was 20 miles per hour for adults and 15 miles per hour when towing children.

According to Murphy's husband, Matas stated at one point during Murphy's ride that the "motorboat was going" " '27 miles per hour.' "[3] When Matas disclosed this, he was, according to Murphy's husband, making very sharp turns, and at one point the tube hit the motorboat's wake and the tube became airborne. Murphy's husband added that Matas drove the motorboat in a similar fashion while he was tubing and one of the children in the tube with him was ejected.

Brad P. Avrit, a civil engineer and Murphy's expert in safety engineering, provided a declaration. He stated that Matas "was apparently engaged in a series of turns ('S' turns), causing the subject raft to be accelerated laterally, making impact with the wake of the subject motorboat . . . , which . . . would be considered 'hot-dogging,' and with the intent of trying to eject passengers from the tube into the water." He added that the speed of the raft at the time that it impacted the motorboat wake would have been significantly greater than the speed of the boat, which was, according to Murphy's

---

[3] Matas denied telling Murphy's husband that he had been going 27 miles per hour. He testified that the maximum speed he reached during Murphy's ride was 18 miles per hour.

4

husband, 27 or 28 miles per hour. He estimated that the tube would have been traveling 34 to 42 miles per hour.

The manual and safety instructions for the motorboat owned by Viss provided as follows: "Use of this product and participation in the sport involves inherent risks of injury or death." It also specified that the "[t]ow vehicle driver is RESPONSIBLE for the rider on the tube since the tube cannot be controlled by the rider, and since the rider's vision can be impaired by the spray from the tube." It also instructed that the "[t]ow vehicle driver should AVOID excessive speed or sharp turns, because the tube will accelerate and arc around corners, which might cause the tube to flip over abruptly, resulting in serious injury or death to the rider(s)." The manual warned that if the boat's speed is 20 miles per hour, the towable speed could be 30 to 50 miles per hour and that the towable speed increases when the boat makes a turn of 90 to 180 degrees.

When Viss replied to Murphy's opposition to his motion for summary judgment, he attached a supplemental declaration of his counsel and attached evidentiary materials, including pictures of Murphy while she was riding on the tube. These photographs included captions that indicated Murphy was having fun. Murphy objected to this evidence, and claimed that the captions were from a website and had been altered by someone other than Murphy.

The trial court granted the motions for summary judgment by Matas, Cornerstone, and Viss. The court ruled that the primary assumption of risk doctrine was a complete defense to Murphy's negligence claim against Matas and Cornerstone under *Record v. Reason* (1999) 73 Cal.App.4th 472 (*Record*). The court found that the claim of negligent entrustment against Cornerstone failed because Cornerstone did not own the motorboat. Additionally, since the court had determined that Matas and Cornerstone had no duty to Murphy, and Viss's liability was derivative, Murphy's claim for negligent entrustment against Viss also failed. Both Murphy and the defendants had raised objections to evidence and the court overruled all of the objections.

Murphy moved for a new trial, which the court denied.  On June 15, 2012, Murphy filed a notice of appeal from the judgment in favor of Viss and from the judgment in favor of Matas and Cornerstone.

## DISCUSSION

### I. *Standard of Review*

We review a trial court's grant of summary judgment de novo.  (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 388-389.)  "In performing our de novo review, we must view the evidence in a light favorable to [the] plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing [the] defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in [the] plaintiff's favor."  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.)

The trial court shall grant the defendant's motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that [defendant] is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant has made the required showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849, 853.)  California law requires that "a defendant moving for summary judgment . . . present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence."  (*Id.* at p. 854, fn. omitted.)

In the present case, the trial court found that the primary assumption of risk doctrine applied.  Whether the assumption of risk doctrine applies in a particular case is a question of law.  (See, e.g., *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 (*Kahn*) ["the question of 'the existence and scope' of the defendant's duty is

one of law to be decided by the court, not by a jury"]; *Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 656; *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632.)  The question whether that duty has been breached is a question of fact.  (See, e.g., *Shin v. Ahn* (2007) 42 Cal.4th 482, 497.)

## II.  *Negligence and the Application of Primary Assumption of Risk*

### A.  *Legal Principles*

"The doctrine of assumption of risk in negligence cases embodies two components:  (1) primary assumption of risk—where the defendant owes no duty to the plaintiff to protect him or her from the particular risk, and (2) secondary assumption of risk—where the defendant owes the plaintiff a duty, but the plaintiff knowingly encounters a risk created by the breach of that duty.  [Citation.]  Primary assumption of risk operates as a complete bar to the plaintiff's cause of action, while the doctrine of secondary assumption of risks is part of the comparative fault scheme, where the trier of fact considers the relative responsibility of the parties in apportioning the loss."  (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 178.)

"Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), some activities—and, specifically, many sports—are inherently dangerous."  (*Kahn, supra,* 31 Cal.4th at p. 1003.)  "Primary assumption of risk is merely another way of saying no duty of care is owed as to risks inherent in a given sport or activity.  The overriding consideration in the application of this principle is to avoid imposing a duty which might chill vigorous participation in the sport and thereby alter its fundamental nature."  (*Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751-752.)

The Supreme Court in *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*) applied the doctrine of primary assumption of risk to an informal game of touch football.  (*Id.* at p. 300.)  The court explained that certain dangers are often integral to "the sport itself" and that defendants generally have no duty to protect a plaintiff from "risks inherent in the sport itself . . . ."  (*Id.* at p. 315.)  Those involved in the sporting activity have a duty not to increase the risk of harm that is inherent in the sport itself.  (*Id.* at p. 320.)  Conduct is

not inherent in a sport "if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Ibid.*, fn. omitted.)

In the recent case of *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148 (*Nalwa*), the Supreme Court clarified that "the primary assumption of risk doctrine is not limited to activities classified as sports, but applies as well to other recreational activities 'involving an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity.' [Citation.]" (*Id.* at p. 1156.) The court stated that a defendant has a limited duty of care under the primary assumption of risk doctrine, which is "the duty not to unreasonably increase the risk of injury over and above that inherent" in the recreational activity. (*Id.* at p. 1152.)

**B.** *Matas Did Not Unreasonably Increase the Risk of Injury to Murphy*

An activity falls under the doctrine of primary assumption of risk if " ' "the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." ' " (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 115.) The court in *Record, supra,* 73 Cal.App.4th 472, held that primary assumption of risk applies when a person is injured while voluntarily participating in the recreational activity of tubing.[4] Murphy does not object to the application of primary assumption of risk to tubing, but contends that the reckless manner in which Matas drove the motorboat increased the risk of injury and therefore there is a triable issue of fact as to whether Matas and Cornerstone breached their duty. (See *Kahn, supra,* 31 Cal.4th at p. 1004 ["defendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport, although they generally do have a duty not to increase the risk of harm beyond what is inherent in the sport"].) Thus, we must determine whether the undisputed facts establish as a matter of law that Matas's conduct did not increase the risk of injury inherent in the sport of

---

[4] Our Supreme Court in *Nalwa, supra,* 55 Cal.4th 1148, did not disapprove of cases in which the doctrine of primary assumption of risk had been applied in contexts other than sports and the court specifically cited *Record*. (*Nalwa,* at pp. 1155-1156.)

8

tubing or that Matas's conduct was not "so reckless as to be totally outside the range of the ordinary activity involved" in tubing. (*Knight, supra,* 3 Cal.4th at p. 320.)

The question of which risks are inherent in a recreational activity is fact-intensive but may be resolved by a summary judgment motion. (*Nalwa, supra,* 55 Cal.4th at p. 1158.) Judges deciding inherent risk questions under this doctrine "may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment." Vigorous participation often includes accidentally careless behavior and imposition of liability in such circumstances would chill participation in the sport. (See *Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1222 (*Moser*); see also *Shin v. Ahn, supra,* 42 Cal.4th at p. 489 ["[u]nder the primary assumption of risk doctrine, the defendant owes *no duty* to protect a plaintiff from particular harms arising from ordinary, or simple negligence"].)

Murphy contends that Matas was reckless in his operation of the motorboat and increased the risks inherent in tubing. Specifically, she asserts that the boat was traveling 27 to 28 miles per hour while the manual and warning label instruct boat drivers not to exceed 20 miles per hour when towing adults in a tube. The manual and label admonish not to exceed 15 miles per hour when towing children in a tube. Additionally, Matas was reckless, according to Murphy, because he made sharp turns.

Arguments similar to those made by Murphy in this appeal were raised by the plaintiff and rejected by the appellate court in *Record, supra,* 73 Cal.App.4th 472. In *Record*, the plaintiff sustained a spinal injury after falling out of an inner tube towed by a motorboat. (*Id.* at p. 475.) The plaintiff sued the person operating the boat, and the trial court granted the defendant's motion for summary judgment on the grounds that the doctrine of primary assumption of risk applied. (*Ibid.*) The plaintiff argued on appeal that even if primary assumption of risk applied to the recreational activity of tubing, he raised a triable issue of fact as to whether the defense did not apply in this particular situation for the following reasons: he told the defendant to go slowly and take it easy because of his preexisting injury; the defendant was reckless because he made a sharp

9

turn and was traveling at 30 miles per hour at the time plaintiff was injured; and the defendant, as the driver of the boat, controlled the tube rider's activity and was not a coparticipant. (*Id.* at pp. 483-485.) The appellate court rejected all of the plaintiff's arguments.

With respect to the first claim that the plaintiff had informed the defendant about his preexisting injury and had asked the defendant to go slowly, the appellate court in *Record, supra,* 73 Cal.App.4th 472, cited the Supreme Court's statement in *Knight* that a party cannot change the inherent nature and risk of a sport by making a unilateral request that other participants play less vigorously. (*Record,* at p. 482, citing *Knight, supra,* 3 Cal.4th at p. 300 [it was immaterial that the plaintiff asked the defendant when playing touch football " ' "not to play so rough" ' " and to " ' "be careful" ' "].) The *Record* court explained that "tube riders engage in the activity of tubing in order to experience the thrill of whipping across the water at speeds [that] challenge their ability to stay on the tube. Both appellant and respondent testified via deposition that falling out of the inner tube is a 'common occurrence' and that '[e]verybody falls off the innertube.' Neither appellant's preexisting injuries nor his admonition to respondent to '[k]ick back' and 'take it easy' can be used to define the nature of the activity or the parties' relationship to it. Nor can these factors be used to redefine the ordinary range of activity and the concomitant risks inherent in the sport and thus enlarge the potential liability of coparticipants." (*Record,* at pp. 483-484, fn. omitted.)

The appellate court in *Record, supra,* 73 Cal.App.4th 472, also considered the plaintiff's assertion that the defendant was reckless as he was going 30 miles per hour and making a sharp turn at the time of the injury and the testimony of plaintiff's expert that these actions exceeded the recommendations of the manufacturers of tubing equipment. (*Id.* at p. 484.) The appellate court in *Record* considered the Supreme Court's holding in *Ford v. Gouin* (1992) 3 Cal.4th 339 (*Ford*), where the plaintiff had been injured while waterskiing. The *Ford* court explained: "Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of

10

undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports.  As a result, holding ski boat drivers liable for their ordinary negligence might well have a generally deleterious effect on the nature of the sport of waterskiing as a whole." (*Id.* at p. 345.)

The court in *Record, supra,* 73 Cal.App.4th 472, presumed for the purpose of the summary judgment review that the boat was traveling five to ten miles per hour over the recommended speed limit for towing adults in the tube and that the respondent made a sharp three-quarter turn.  (*Id.* at p. 485.)  The court concluded that such activity "was merely negligent, 'an "inherent risk" of [the] sport,' barring recovery for the [plaintiff].  [Citation.]  Holding a boat driver to a duty to ensure the tube rider does not fall off the tube would inevitably chill the driver's willingness to provide the exciting ride that appears to be necessary to tubing and would narrow the spectrum of excitement, changing the fundamental nature of the sport." (*Record,* at p. 485.)

The court in *Record, supra,* 73 Cal.App.4th 472, also discounted the contention that the primary assumption of risk doctrine did not apply because the boat driver had control over the tube rider's speed and direction.  (*Id.* at p. 485.)  The court noted that the boat driver was considered to be a coparticipant in the sport of waterskiing (see *Ford, supra,* 3 Cal.4th at p. 345), and thus a boat driver was a coparticipant in tubing.  (*Record,* at pp. 485-486.)  The court noted that both parties chose to engage in a mutually enjoyable activity and, thus, both the tube rider and the boat driver were participants in that activity.  (*Ibid.*)

Under the holding of *Record, supra,* 73 Cal.App.4th 472, the primary assumption of risk doctrine bars any claim of negligence in the present case.  (See also *Bjork v. Mason* (2000) 77 Cal.App.4th 544, 550 (*Bjork*) [applied primary assumption of risk to tubing].)  Murphy's argument that the primary assumption of risk doctrine does not prevent her claim is based on her evidence that Matas was traveling 27 to 28 miles per hour and that driving at this speed was reckless because the manual and warning label instructed boat drivers not to exceed 20 miles per hour when towing adults in a tube and 15 miles per hour when towing children in a tube.  Further, she claims that Matas was

11

reckless when he made a sharp turn. As already discussed, these identical arguments were raised and rejected in *Record.* Thus, even if we presume that Matas was driving the boat seven to eight miles per hour above the recommended speed for an adult and was making sharp turns, such behavior was simply negligent and not intentional or reckless misconduct outside the range of ordinary activity involved in tubing. Murphy asserts that a child was in the tube and thus Matas should have been traveling 15 miles per hour. Murphy, however, is an adult and there is no claim of an injury by a child in this lawsuit.

Murphy also argues that even Schaffer admitted in his declaration that pulling the tube across the wake at a high speed creates the risk that riders in the tube will be ejected into the water. She asserts that the evidence showed that Matas was trying to eject the riders from the tube. In support of this, she cites the speed of the boat, the fact that other people complained of injuries, and the fact that one child was thrown from the boat.

None of Murphy's evidence creates a triable issue regarding whether Matas intended to throw people from the boat. More significantly, Murphy was not injured because she was thrown into the water. She was not thrown into the water. Her injury to her back was sustained while riding in the tube. Thus, the question is whether Matas intended to injure Murphy or engaged in reckless conduct. As already discussed, presuming that the speed of the boat was above the recommended 20 miles per hour for an adult, this speed did not constitute reckless conduct that increased the risks above those inherent in tubing. (See *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1276 (*Distefano*) [conduct of the driver of a dune buggy was not so reckless as to be completely outside the range of the activities involved in the sport of off-roading when he collided with an off-road motorcycle and "was driving fast in the middle of a narrow dirt trail and cresting a blind hill"].) Nor does any of the evidence show any intent to injure Murphy. Indeed, in her separate statement of undisputed facts in opposition to the summary judgments in the lower court, Murphy indicated that it was "[u]ndisputed that she did not allege that Matas intentionally injured her."

Finally, Murphy stresses that Matas knew that she had been in the hospital just before this incident. This fact, however, is irrelevant to the application of the primary

12

assumption of risk doctrine. The focus is on the nature of the sport or recreational activity itself and not the particular plaintiff's subjective knowledge or expectations and the plaintiff's preexisting injury cannot change the definition of the activity or the parties' relationship to it. (*Knight, supra,* 3 Cal.4th at pp. 312-313; *Record, supra,* 73 Cal.App.4th at pp. 482, 483.)

Tubing clearly involves riding in an inflatable tube and the risk that the ride might be turbulent and that the tube might go airborne. "[T]ube riders engage in the activity of tubing in order to experience the thrill of whipping across the water . . . ." (*Record, supra,* 73 Cal.App.4th at p. 483.) Requiring the driver of the boat towing the raft to eliminate any risk that would prevent a person from suffering a back injury, as Murphy suffered, while riding in a turbulent or airborne raft would alter the fundamental nature of tubing. Here, Murphy voluntarily participated in tubing and suffered the type of injury that is inherent to tubing. Accordingly, we conclude that the doctrine of primary assumption of risk bars Murphy's claim of negligence.

## C. *Evidentiary Rulings*

Murphy argues that the trial court incorrectly overruled her objections to the evidence Viss submitted with his reply to Murphy's opposition to his summary judgment motion. In particular, she objects to three photographs of Murphy that were found at a website that showed a smiling Murphy in the tube with captions, such as, "Laughing tons." Murphy argues that the trial court erred in considering this evidence because it was attached to Viss's reply papers and that this error should result in reversal. (See *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 312-313 [right to due process violated when court granted summary judgment and relied on evidence filed after the opposition to the summary judgment motion had been filed].)

The photographs of Murphy in the tube, without the captions, had been produced by Murphy in discovery. Murphy maintains that someone else altered the captions taken from the web site. She maintains that the original caption stated, "Laughing tons, but that was before we were about 3½ feet into the air!!!"

13

Murphy incorrectly asserts that any error in considering this evidence should result in reversal. Murphy must show that she was prejudiced by the trial court's failure to strike the evidence attached to Viss's reply papers. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) Here, Murphy's sole claim of prejudice is that the "deleted language puts a far different spin on Murphy's attitude toward the ride than is reflected by Viss's argument in his reply[,] which is based upon altered evidence."

Murphy has completely failed to demonstrate any prejudice. The photographs depicting Murphy as enjoying herself or laughing while tubing with captions indicating that she was enjoying her tubing experience are completely irrelevant. As already discussed, Murphy's subjective experience has no bearing on the application of the primary assumption of risk doctrine. (See *Knight, supra,* 3 Cal.4th at pp. 312-313.) Thus, even if this evidence was erroneously considered, any such error was harmless.

**D.  *Spoliation***

Murphy claims that Matas offered different explanations regarding the disappearance of the envelope he received from Viss. She asserts that Viss gave Matas an envelope that contained the manuals to the boat and raft and Matas was unable to produce this envelope. She contends that the missing envelope creates "an inference of spoliation of evidence" that reflects Matas's "consciousness of guilt" and that this inference provided sufficient evidence to require the negligence claim go to the jury.

Viss testified he recalled giving Matas an envelope with some information when Matas borrowed his boat and inflatable raft. He recalled that the envelope contained manuals of the boat, the current registration, and insurance. He could not remember whether there was any manual in the envelope concerning the Sea-Doo tube. Matas testified that he simply pulled out the registration and insurance from the envelope and then put them back into the envelope. He denied pulling out or looking at the manuals. When asked what he did with the envelope, he answered: "I held onto it, had it in my possession throughout the event in case it was necessary to use it. . . . [¶] I typically make a copy of those things and then destroy them afterwards, but I don't know what I did with it after that. I have looked for it and haven't found it." Subsequently, Matas

14

testified that he probably last saw the envelope about a month after the tubing incident when he spotted it on his desk. He stated that he was going to mail it back to Viss but must have misplaced it.

Murphy claims that the abovementioned testimony is contradictory and supports an inference of spoliation of evidence. He maintains that Matas destroyed the evidence, which shows a consciousness of guilt or liability and cites numerous cases on spoliation. (*Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1841 [false exculpatory statement is evidence of consciousness of liability]; *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 994 [in sexual harassment case, the harasser's personnel file could not be located, and the appellate court upheld the trial court's instruction that the jury could infer that the file contained evidence damaging to the defendant's case if it concluded that the defendant had suppressed the file], disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664; *People v. Neely* (1993) 6 Cal.4th 877, 896-897 [evidence of flight admissible to indicate consciousness of guilt]; *People v. Burns* (1987) 196 Cal.App.3d 1440, 1455 [letter showing a plan to fabricate evidence to exonerate the defendant is relevant to show a consciousness of guilt]; *Thor v. Boska* (1974) 38 Cal.App.3d 558, 565-568 [defendant unable to produce original clinical record concerning treatment of plaintiff after charged with malpractice, and unavailability of original records created a strong inference of consciousness of guilt].)

None of the foregoing cases relied upon by Murphy is relevant. First, Matas's testimony did not support an inference of spoliation. Matas consistently stated that he did not know what he did with the envelope. He did not deny that the manuals were inside the envelope; he claimed that he had not read them if they were in the envelope. Second, destroying the envelopes did not prevent the court from knowing the information contained in the manuals. Indeed, Murphy presented the contents of the manuals in support of her summary judgment motion. Third, whether Matas read the manuals was not material to the application of the primary assumption of risk doctrine. Even if we presume that the envelope contained the manuals and that Matas read them and then destroyed the envelope, the primary assumption of risk doctrine still applies. As already

15

discussed, Matas's knowledge of the dangers posed by his conduct or the maximum speed to drive the boat is immaterial as the record is devoid of any allegation or evidence that Matas intended to injure Murphy. Matas's knowledge about the speed limit contained in the manual had no bearing on the *objective* standard of whether his conduct increased the risk inherent to tubing.

## E. *Negligence Per Se*

Murphy argues that Matas violated the Harbors and Navigation Code section 655, subdivision (a) and that this violation constitutes negligence per se, and defeats the primary assumption of risk doctrine. This statute provides: "No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb, or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed." (Harb. & Nav. Code, § 655, subd. (a).) Matas also cites Harbors and Navigations Code section 650, which states that "[i]t is the policy of this state to promote safety for persons and property in and connected with the use and equipment of vessels and to promote uniformity of laws relating thereto."

Negligence per se is an evidentiary doctrine codified at Evidence Code section 669. This doctrine is based on "the rule that a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm that the plaintiff suffered as a result of the violation." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285.) If the presumption of negligence is established under subdivision (a) of Evidence Code section 669, it may be rebutted under subdivision (b) of this statute. Thus, the doctrine of negligence per se does not establish tort liability or a private right of action for violation of a statute. (*Quiroz,* at p. 1285.)

In her opening brief, Murphy does not mention *Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1569 (*Whelihan*) or *Peart v. Ferro* (2004) 119 Cal.App.4th 60, 65

(*Peart*), which hold that negligence per se based on violating provisions of the Harbors and Navigation Code does not abrogate the primary assumption of risk doctrine. Rather, she relies upon the concurring opinion in *Ford, supra,* 3 Cal.4th at page 351 (conc. opn. of Kennard, J.). In the concurring opinion, Justice Kennard was joined by Justices Panelli and Baxter, and they maintained that a plaintiff who has proceeded to encounter a known risk should be deemed to have impliedly consented to any harm incurred and should be completely precluded from recovering damages as compensation from the party who posed the known risk. (*Id.* at pp. 351-364.) The concurrence in *Ford* does not benefit Murphy but, in any event, the majority in *Nalwa, supra,* 55 Cal.4th at page 1158 clearly rejected applying the implied-consent theory set forth by Justice Kennard in her concurrence in *Ford*.

Murphy also quotes extensively from the dissenting opinion of Chief Justice George (*Ford, supra,* 3 Cal.4th at pp. 364-365) and the dissenting opinion of Justice Mosk (*id.* at p. 369) in *Ford*. These justices stated that the plaintiff was within the class of persons Harbors and Navigation Code section 658 was intended to protect, and therefore under Evidence Code section 669, the defendant had violated a legal duty of care to the plaintiff. (*Ford,* at pp. 364-369.) As the court in *Moser, supra,* 105 Cal.App.4th 1211 pointed out, subsequently, in *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1069-1070 (*Cheong*), four justices expressed the view that Evidence Code section 669 does not bar the application of the assumption of risk doctrine *unless* the language of the statute indicates a legislative intent to eliminate the assumption of risk defense. (*Moser,* at pp. 1225-1226.)

In her reply brief, Murphy claims that the Supreme Court in *Nalwa, supra,* 55 Cal.4th 1148 pronounced that negligence per se trumps the application of the primary assumption of risk doctrine. In *Nalwa,* the plaintiff who was injured while riding bumper cars asserted that amusement parks are subject to state regulations for safety and inspection, which should preclude applying the primary assumption of risk doctrine to amusement park rides. (*Id.* at p. 1159.) The *Nalwa* court observed that the plaintiff was not asserting that the defendant had violated any particular regulation in the operation of

17

the ride and was "not arguing for a presumption of negligence under Evidence Code section 669, subdivision (a) that would preclude application here of the assumption of risk doctrine. (See generally *Cheong . . . , supra,* 16 Cal.4th at pp. 1070-1072.)" (*Nalwa,* at p. 1159.) In support of her argument, Murphy quotes the above language in *Nalwa* and omits the citation to *Cheong.* Although separate opinions in *Cheong* indicated that the justices held varied views on the relationship between the assumption of risk and the doctrine of negligence per se, the majority of the justices expressed the opinion that the common law principles of *assumption* of risk are not abrogated by the violation of a statute unless the statute evinces a clear intent to modify common law assumption of risk principles. (*Cheong,* at pp. 1069-1070.) Thus, the above quote from *Nalwa,* when interpreted in its entire context, simply indicates that the plaintiff was not arguing that negligence per se applied and therefore the defense of the assumption of risk could not be disregarded on that basis. Negligence per se, however, could survive this defense if the violated statute expresses a clear intent to modify common law assumption of risk principles.

Although the Supreme Court has not yet directly addressed the application of primary assumption of risk when the defendant's negligence is based on the violation of a statute, Courts of Appeal have held that statutory provisions do not abrogate this defense unless the Legislature "has explicitly and unambiguously manifested a clear intent to do so. [Citations.]" (*Peart*, *supra*, 119 Cal.App.4th at p. 79; *Whelihan*, *supra*, 110 Cal.App.4th at p. 1575; see also *Moser, supra,* 105 Cal.App.4th at p. 1226 [facts showed that the bicyclist defendant violated provisions of the Vehicle Code while participating in the long-distance bicycle ride but the injured bicyclist's claim of negligence per se was barred by the primary assumption of risk doctrine because a collision between bicycle riders was an inherent risk in the ride]; *Distefano, supra,* 85 Cal.App.4th 1249 [motorcyclist injured when he collided with a dune buggy while engaged in the sport of off-roading could not recover on a claim of negligence per se based on violations of the Vehicle Code because the collision was an inherent risk in the sport and the primary

18

assumption of risk doctrine barred the claim].) In her reply brief, Murphy asserts that *Peart* and *Whelihan* were wrongly decided.

In *Whelihan, supra,* 110 Cal.App.4th 1566, two jet skiers collided and the injured skier sued the other for, among other things, negligence per se. (*Id.* at p. 1569.) The injured skier claimed that the doctrine of primary assumption of risk did not apply because Harbors and Navigation Code sections 655, subdivision (a), and 655.7, subdivision (c) define the duty and standard of care when operating watercraft on public waterways and these statutes were enacted after the Supreme Court's decisions in *Knight, supra,* 3 Cal.4th 296 and *Ford, supra,* 3 Cal.4th 339. (*Whelihan,* at p. 1574.) In rejecting the plaintiff's contention, the court explained that permitting the Harbors and Navigation Code to " 'trump' " the doctrine of primary assumption of risk "would chill vigorous participation in the sport of jet skiing and . . . have a deleterious effect on the nature of the sport." (*Whelihan,* at pp. 1574, 1575.)

In *Peart, supra,* 119 Cal.App.4th 60, our court considered a claim for negligence per se when a minor was injured in a collision with another minor and both were in personal watercraft. The court concluded that the primary assumption of risk applied. (*Id.* at p. 78.) The plaintiff argued that Harbors and Navigation Code sections 655.6, 658.5, and 655.3 " 'govern the operation of personal watercraft by minors in California,' " and [that] these statutes "establish specific duties of care inconsistent with the primary assumption of risk doctrine, impose criminal penalties, and thereby necessarily give rise to civil liability for their violation pursuant to Evidence Code section 669." (*Peart,* at pp. 78-79, fn. omitted.) The court noted that courts "have repeatedly affirmed that statutory provisions like those at issue do not abrogate, supersede or displace the primary assumption of risk doctrine unless the legislative authority has explicitly and unambiguously manifested a clear intent to do so." (*Id.* at p. 79, citing *Cheong, supra,* 16 Cal.4th at pp. 1069-1070; *Moser, supra,* 105 Cal.App.4th at pp. 1225-1226; *Distefano, supra,* 85 Cal.App.4th at pp. 1266-1267, 1271-1274.) At the time these statutes were enacted, the Legislature was aware of the primary assumption of risk doctrine in *Ford, supra,* 3 Cal.4th 339, which had applied this doctrine to the sport of

19

water-skiing. The court in *Peart* concluded that "if the Legislature had intended to supersede this well-known common law doctrine, it would have said so." (*Peart,* at p. 81.) The court held that primary assumption of risk was a complete defense to the claim of negligence per se, which had been based on violations of the Harbors and Navigations Code. (*Peart,* at p. 82.)

Murphy complains that *Whelihan* and *Peart* were wrongly decided. She complains that these courts ignored language in *Finnegan v. Royal Realty Co.* (1950) 35 Cal.2d 409, overruled on another issue in *Witt v. Jackson* (1961) 57 Cal.2d 57, 70. In *Finnegan,* the employees of a tenant sued a landlord when they were injured in a fire on the property owned by the landlord. This case is not relevant as it did not involve *primary* assumption of risk, and did not involve the *voluntary* participation in an activity where the risk could not be eliminated without altering the fundamental nature of the activity.

We agree with the reasoning of *Peart, Whelihan, Moser,* and *Distefano* and hold that the defense of primary assumption of risk bars a claim of negligence per se unless the statute violated explicitly and unambiguously manifests a clear intent to supersede the primary assumption of risk defense or the plaintiff establishes that the participant breached his or her legal duty by intentionally injuring the plaintiff or by engaging in conduct that was so reckless as to be completely outside the range of the ordinary activity involved in the sport or recreational activity.

## II. *Negligent Entrustment*

Murphy also alleged a cause of action for negligent entrustment against Cornerstone and Viss. To prove negligent entrustment, Murphy must prove that Matas was negligent in his operation of the boat; that Viss (or Cornerstone) was an owner of the boat operated by Matas; that Viss (or Cornerstone) knew, or should have known, that Matas was incompetent or unfit to drive the boat; that Viss (or Cornerstone) permitted Matas to use the boat; and that Matas's incompetence or unfitness to drive was a substantial factor in causing harm to the plaintiff. (See *Jeld-Wen, Inc. v. Superior Court* (2005) 131 Cal.App.4th 853, 863-864, citing CACI No. 724.)

20

It is undisputed Viss is the sole owner of the boat driven by Matas. Thus, the trial court properly granted summary judgment in favor of Cornerstone, since the undisputed facts establish that Cornerstone did not own the boat.

Furthermore, the court correctly granted summary judgment in favor of both Viss and Cornerstone because the primary assumption of risk defense prevents Murphy's negligent entrustment cause of action. One of the elements of negligent entrustment is that the driver of the boat was negligent. (See *Jeld-Wen, Inc. v. Superior Court, supra,* 131 Cal.App.4th at pp. 863-864.) Since we have concluded that Matas did not breach any legal duty to Murphy when he was driving the motorboat, Murphy's claim of negligent entrustment must also fail, as she cannot, as a matter of law, establish the element of the driver's negligence.

The court in *Truong v. Nguyen* (2007) 156 Cal.App.4th 865 addressed the plaintiff's claim of negligent entrustment in a situation where the defense of primary assumption of risk applied and thus the driver of the boat had no legal duty to the participant in the activity. In *Truong,* two personal watercrafts collided and the passenger in one of the boats died. The parents of the decedent sued the driver and owner of the watercraft involved in the collision for wrongful death based on negligence, negligence per se, and negligent entrustment. (*Id.* at pp. 869-870.) The court concluded that the defense of primary assumption of risk applied to the passenger of the watercraft. (*Id.* at p. 892.) The court cited *Whelihan* and *Peart* and affirmed the trial court's ruling that the negligence per se cause of action lacked merit because the primary assumption of risk doctrine trumped any duty that might be based on a violation of the statute or regulations. (*Truong,* at p. 892.) The court stated that its "conclusion that the assumption of risk doctrine applies to the negligence cause of action against [the driver of the watercraft] and relieved him of any duty to [the decedent] undercuts [the parents'] claim of negligent entrustment. If [the driver] was not negligent because he had no duty to [the decedent], then [the owner of the watercraft] cannot be negligent in entrusting the vessel to [the driver]." (*Id.* at p. 893.)

21

Murphy relies on our decision, *Bjork, supra,* 77 Cal.App.4th 544, when urging this court to conclude that the negligent entrustment claim can survive the defense of primary assumption of risk. In *Bjork,* the defendant owned and supplied the boat used for tubing. (*Id.* at p. 552.) The plaintiff was riding in the inner tube that was being towed by the motorboat driven by the defendant and was injured when the rope broke and struck him. We concluded that the defendant in his capacity as the boat operator was not liable because his acts were neither intentional nor reckless and the defense of primary assumption of risk applied. (*Id.* at pp. 551-552.) The trial court should not have granted summary judgment, however, because the primary assumption of risk doctrine did not apply as an absolute bar to the plaintiff's theory that the defendant, as the owner of the boat, negligently supplied a defective cable, which snapped and caused injury to the plaintiff. (*Id.* at p. 55.) "[T]he act of supplying the equipment is something separate and distinct from participation in the sport and the tests for liability are accordingly different." (*Id.* at p. 553, italics omitted.) We held that the owner had a duty not to materially increase the risks to the participant beyond those inherent in the participation in the sport or activity, and the defense of primary assumption of risk did not insulate equipment suppliers from liability for injury from providing defective equipment. (*Id.* at pp. 553-556.)

Unlike the situation in *Bjork,* the present record contains no allegation or evidence that Murphy was injured as a result of any defect in the motorboat or Sea-Doo raft. The allegations are that Murphy was injured as a result of Matas's operation of the motorboat. Since we have concluded that Matas did not breach any legal duty to Murphy and was not liable for his driving of the boat, Viss and Cornerstone cannot be liable to Murphy for providing the motorboat and tube to Matas. There is no allegation or evidence that Viss or Cornerstone materially increased the risks inherent to tubing. *Bjork* is not helpful to Murphy.

Accordingly, the trial court did not err in granting summary judgment against Murphy's claim of negligent entrustment.

22

## DISPOSITION

The judgment is affirmed.  Murphy is to pay the costs of appeal.


_____
Brick, J.*


We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.